## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY ANN HOLBROOK, individually )<br>and as Executrix of the ESTATE OF )<br>RONALD HOLBROOK, and as personal )<br>representative of the statutory beneficiaries )<br>RONALD HOLBROOK, AND PATRICK )<br>DANIEL HOLBROOK, individually, )<br>)<br>        Plaintiffs, )<br>)<br>     v. )<br>)<br>MICHAEL SCOTT WOODHAM, )<br>NEW ENTERPRISE STONE AND LIME )<br>COMPANY, INC., AND L. ROBERT )<br>KIMBALL AND ASSOCIATES, )<br>)<br>        Defendants, )<br>)<br>     v. )<br>)<br>BRUCE & MERRILEES ELECTRICAL )<br>COMPANY )<br>)<br>        Third-Party Defendant. ) | CIVIL ACTION NO. 3:05-304<br><br>JUDGE KIM R.GIBSON |

# MEMORANDUM OPINION and ORDER

**GIBSON, J.**

This matter is before the Court on Defendant L. Robert Kimball & Associates's ("Kimball")

Motion for Summary Judgment (Doc. No. 118), Defendant New Enterprise Stone and Lime

Company's Motion for Summary Judgment (Doc. No. 122), and Third-Party Defendant Bruce &

Merrilees Electrical Company's Omnibus Motion to Dismiss Third-Party Complaints (Doc. No.

146). Defendant Michael Scott Woodham partially joins in Defendant New Enterprise Stone and Lime Company's Motion for Summary Judgment. (Doc. No. 128).

Defendant Kimball filed a Brief in Support (Doc. No. 119) and a Concise Statement of Material Facts (Doc. Nos. 120, 121). In response to Defendant Kimball's motion, Defendant New Enterprise Stone and Lime Company has filed a Memorandum in Opposition (Doc. No. 136) and a Response to Kimball's Concise Statement of Material Facts (Doc. Nos. 137, 138), Defendant Michael Scott Woodham has filed a Response to Kimball's Concise Statement of Material Facts (Doc. Nos. 131, 135), Third-Party Defendant Bruce & Merrilees Electric Company has filed a Reply (Doc. No. 127), and Plaintiff has filed a Response in Opposition (Doc. Nos. 133, 139, 142). In turn, Kimball filed Replies to New Enterprise's Response in Opposition (Doc. No. 173) and Plaintiffs' Response in Opposition (Doc. No. 174). For the reasons stated herein, Defendant Kimball's motion is granted.

In support of its motion, Defendant New Enterprise Stone and Lime Company has filed a Memorandum in Support (Doc. No. 123) and a Concise Statement of Material Facts (Doc. Nos. 124, 125). Defendant Michael Woodham has filed a Reply in Partial Opposition and Partial Joinder (Doc. No. 128), a Memorandum (Doc. No. 129), and a Response to New Enterprise's Concise Statement of Material Facts (Doc. No. 130). Third-Party Defendant Bruce & Merrilees Electric Company has filed a Reply (Doc. No. 127), and Plaintiff has filed a Response in Opposition (Doc. Nos. 134, 140, 143). In response to these filings, New Enterprise filed Memoranda in Reply to the Responses of Michael Scott Woodham (Doc. No. 177) and Plaintiff (Doc. Nos. 179, 181) and a

2

Response to Plaintiff's Additional Statement of Facts (Doc. No. 180). For the reasons stated herein, Defendant New Enterprise's motion is granted in part and denied in part.

Defendant Michael Scott Woodham has filed a Concise Statement of Material Facts (Doc. No. 132) and Defendant New Enterprise has filed a response to that statement (Doc. No. 178).

In support of its motion to dismiss, Third-Party Defendant Bruce & Merrilees has filed a Memorandum of Law (Doc. No. 147). Defendant Kimball has filed a Response in Opposition (Doc. No. 150) and a Brief in Opposition (Doc. No. 151), Defendant Woodham has filed a Brief in Opposition (Doc. No. 152), and Defendant New Enterprise has filed a Response (Doc. No. 153) and Brief in Opposition (Doc. No. 154). For the reasons stated herein, Third-Party Defendant Bruce & Merrilee's motion is granted in part and denied in part.

## UNDISPUTED FACTUAL HISTORY

The following are the undisputed facts of record in the case *sub judice*.[1] The instant action arises out of a motor vehicle accident, which occurred on May 10, 2004, at the Bedford County Airport located in Bedford County, Pennsylvania.

The Bedford County Air Industrial Authority ("Air Authority") undertook a project to extend the runway and perform other related construction work at the Bedford County Airport. The Air Authority project entailed two extensions: first, the extension of approximately 910 feet to runway 14-32 at the Bedford County Airport and second, the extension of the parallel taxiway to the new runway as well as an overlay of existing runway pavement. Furthermore, the project

[1] If a proposed fact of the Defendant is not included herein it was considered in dispute by the Court. Some of the facts as set forth have been modified by the Court to conform such proposed facts to the exhibits upon which the proposed facts rely. This was done to ensure that the proposed fact does not misconstrue the evidence supporting it.

would repair a dip in the existing runway and replace the existing runway lighting system. The Air Authority entered into a prime contract with New Enterprise Stone and Lime Company, Inc. ("New Enterprise") to mill and pave the runway. The Air Authority entered into a separate prime contract with Bruce & Merrilees Electric Company ("B&M") for electrical work and runway lighting installation. The Air Authority entered into a contract with Kimball("Kimball"), for the design of the project, management of the work site, inspection of the work and representation of the Air Authority at the work site. During the design phase of the Bedford Airport Project, the plans and specifications were developed by Kimball and approved by the owner Air Authority as well as the PennDOT Bureau of Aviation.

On January 27, 2004, Kimball and B&M held a meeting in which the sequence of construction was discussed. The concrete to create the duct bank had to be poured at least seven (7) days before any blacktop could be placed over the concrete. The electrical work at the crossover had to be complete before New Enterprise paved the runway so that New Enterprise would not have to return to repave the crossovers. The Bedford County Airport was to be closed for New Enterprise to perform the milling and paving operation. At the April 19, 2004 project meeting, it was determined that the best week to close the runway would be the first or second week of May and the New Enterprise paving project was planned to coincide with one of these weeks. At the May 3, 2004 project meeting, it was determined that the runway would be closed from May 10, 2004 through May 15, 2004 for the milling and paving work. New Enterprise provided a schedule, which reflected that milling, crack sealing and paving fabric would be performed on Monday, May 10, 2004, with paving beginning on Tuesday, May 11, 2004.

4

On May 10, 2004, Defendant New Enterprise and Third-Party Defendant B&M were performing work at the Bedford County Airport. The relevant scope of New Enterprise's work on the Bedford Airport Authority project included milling the runway at the Bedford Airport. Milling began by 7:15 a.m. that day. New Enterprise's milling operation involved a machine which would mill along the length of the existing runway with the resultant excess milling material being hauled away by dump trucks to either an on-site location or to New Enterprise's Ashcom quarry. Ashcom quarry is located 10 miles from the Bedford County Airport. The first day for the runway milling operation performed by New Enterprise was May 10, 2004. The relevant scope of B&M's work on the Bedford Airport project involved installing runways and taxiway lighting at the Bedford County Airport. Defendant B&M had (11) employees at the airport on the day of the accident.

On May 10, 2004, Defendant Michael Woodham ("Woodham") was working on the Bedford Airport project for New Enterprise. After hauling stone to Fulton County, Woodham was informed by New Enterprise's dispatcher to go to the Bedford County Airport in order to work on the project. When Woodham arrived at the site, he approached Richard Delozier ("Delozier") of New Enterprise and Delozier informed him that he would be working on the milling project. On the morning of May 10, 2004, New Enterprise's Delozier communicated to the haulers, such as Mr. Woodham, that it was acceptable to drive over the trench in the area where the accident later occurred. In assisting with the milling operation, Defendant Woodham would wait for his turn to approach the milling machine; he would then approach and follow along with the milling machine until his truck was fully loaded. He would then haul the millings to the Ashcom quarry to deposit the load. After taking his third load of milling back to Ashcom quarry, Woodham returned to the

5

airport and parked at a crossover connecting the runway to the taxiway. He then waited for the milling machine to be ready to load his truck.

On the day in question, the runway was shut down for the milling operation and for the grade transition from the runway extension to the existing runway. With the extension, the Bedford County Airport runway was just five (5) feet short of one (1) mile in length. There were no markers or cones at the crossover where Woodham was parked and he was parked in a perpendicular fashion in relation to the runway as he waited at the crossover. While waiting at the crossover, Woodham observed the milling machine near the end of the runway and also observed two people and a backhoe adjacent to the crossover. Woodham was parked at the crossover for approximately thirty (30) minutes before he was instructed by one of the other truck drivers, Chris Sechler ("Sechler"), to proceed to the milling machine. Woodham did not know anyone was going to work in front of his truck at the trench in crossover 3 and did not see anyone walking in front of his truck or working at the trench in crossover 3.

On the morning of the accident, Joe Harper Jr. ("Harper, Jr.") was acting foreman for B&M at the Bedford Airport worksite. At all times relevant hereto, Harper, Jr. was an agent, servant and/or employee of B&M. B&M employees, including Ronald Holbrook ("Holbrook") were involved in laying grounding wire across a crossover which connected the taxiway to the runway. The grounding wire was laid in a trench spanning the crossover and attached to the runway lights within the crossover. After the grounding wire was attached, B&M employees intended to fill the trench with concrete. Prior to the accident, B&M employees were aware that dump trucks were accessing the runway milling operation by using crossovers. During the morning of May 10, 2004,

6

B&M trenched across two crossovers. After the trenches were dug, they did not put up any cones or barricades to prevent anyone from accessing the runway from those crossovers. On May 10, 2004, Holbrook's duties included clearing debris from the trenching area and laying the grounding system for the lights within the crossover. Harper Jr.'s truck, which held the grounding wire, was parked in the grass near the crossover and Holbrook pulled the grounding wire from the truck and placed it into the trench across the crossover.

Holbrook's work of installing the ground wire involved fastening the copper ground wire to the lighting canister with a lug nut and bolt. The process of pulling the ground wire from the truck, placing it in the trench and fastening it to the canister takes about five (5) to ten (10) minutes total. From the right side of the trench, Holbrook took the end of the copper wire and pulled it approximately 250 feet across the crossover. After pulling the wire across the crossover, Ron Holbrook headed back approximately 140-150 feet to attach the ground wire to the lighting canister. He then knelt down near the lighting canister. While Holbrook attached the ground wire to the lighting canister, Harper. Jr. was speaking with his son, Joe Harper, III ("Harper III"), who had stopped by to ask him a question about signage. In attempting to attach the ground wire, Holbrook was lying on his stomach working on the lighting canister near the middle of the crossover. He was situated on the runway side of the crossover, facing Defendant Woodham's truck.

As Harper III was speaking with his father, Defendant Woodham was directed via radio by another truck driver, Sechler, to proceed to the milling machine to fill his truck; he put the truck in gear, released the brakes and proceeded forward. Before proceeding forward, Woodham did not get out of his truck to check if anyone was in front of his vehicle; nor did he do anything else to check

7

if there was anything or anyone in front of his vehicle. Harper III turned around and saw Holbrook underneath Woodham's truck. As Woodham crossed the trench where Holbrook was working, he heard people yelling at him to stop. He stopped his vehicle, set the brake and turned the truck off. He exited his truck and saw that Holbrook was under the right side of his truck. Although Woodham's truck was parked in the crossover when Harper, Jr. and Holbrook arrived at the crossover, neither Holbrook nor anyone from Bruce & Merrilees ever notified Woodham that they would be working in front of Woodham's truck. Holbrook and Harper, Jr. had only been at the crossover for about fifteen (15) minutes from the time they arrived to the time that the accident occurred.

Woodham owned the tri-axle dump truck that he operated on May 10, 2004. Woodham did not store this truck on New Enterprise property. He either stored the truck at his home or at the garage where maintenance was performed. Woodham was responsible for the maintenance and upkeep of his truck, including but not limited to periodic maintenance, purchasing gasoline, purchasing and changing the oil and purchasing insurance on the truck. It was Woodham's responsibility to determine the route to take to the quarry.

## PROCEDURAL HISTORY

This matter concerns a complaint filed by the Plaintiff on July 14, 2005, seeking damages for survival and wrongful death arising out of a construction site accident which resulted in the death of Holbrook. (Doc. No. 1). New Enterprise, Woodham, and Kimball responded to Plaintiffs' complaint by filing Motions to Dismiss (Doc. Nos. 14, 16, and 28) and Kimball filed a second Motion to Dismiss based upon Plaintiffs' failure to file a Certificate of Merit as required by

8

Pennsylvania Rule of Civil Procedure 1042.1 *et seq*. By Order of this Court, dated September 26, 2006, Patrick Holbrook's claim for negligent infliction of emotional distress was dismissed and Kimball's Motion to Dismiss based on the Certificate of Merit was denied. (Doc. No. 52). Kimball filed a Motion for Reconsideration of its Motion to Dismiss based upon the Certificate of Merit Rule. (Doc. No. 55).

On October 26, 2006, Plaintiffs filed an Amended Complaint. (Doc. No. 62). On November 6, 2006, Kimball filed an Answer and Affirmative Defenses with cross-claims against New Enterprise and Woodham. (Doc. No. 64). On November 15, 2006, New Enterprise filed an Answer and Affirmative Defenses with cross-claims against Woodham and Kimball. (Doc. No. 65). On November 21, 2006, Woodham filed an Answer and Affirmative Defenses with cross-claims against New Enterprise and Kimball. (Doc. No. 68). All Defendants answered the cross-claims. (Doc. Nos. 57, 63, 66, 69, 70). On July 13, 2007, this Court granted Kimball's Motion for Reconsideration and dismissed Plaintiffs' claims in their Amended Complaint with regard to professional negligence against Kimball. (Doc. No. 91).

On July 20, 2007, a Motion for Joinder of Bruce & Merrilees Electric Company was filed. (Doc. No. 92). On August 17, 2007, the Motion for Joinder was granted. (Doc. No. 104). Third-Party Complaints were then filed by Kimball, New Enterprise, and Woodham. (Doc. Nos. 108, 109, 111). On October 31, 2007, Kimball filed their instant Motion for Summary Judgment (Doc. No. 118) and on November 1, 2007, New Enterprise filed their instant Motion for Summary Judgment. (Doc. No. 122). On November 16, 2007, a Joint Stipulation for Dismissal Without Prejudice of Defendant L. Robert Kimball and Associates, Inc.'s Claim for Contractual Indemnification Against

9

Defendant New Enterprises was entered into between New Enterprise and Kimball. (Doc. No. 126). On November 23, 2007, B&M filed their instant Motion to Dismiss Third-Party Complaints. (Doc. No. 146).

## DISCUSSION

### Jurisdiction and Venue

The Court has jurisdiction over the state claims in this matter pursuant to 28 U.S.C. § 1332 (a)(1). Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a)(2).

### Legal standard for summary judgment

A "principal purpose [] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . and it should be interpreted in a way that allows it to accomplish this purpose." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265, 274 (1986). Federal Rule of Civil Procedure 56 must therefore "be construed with due regard not only for the rights of persons asserting claims . . . that are adequately based in fact to have [them] tried to a jury, but also for the rights of persons opposing such claims . . . to demonstrate . . . prior to trial, that the claims . . . have no factual basis." Id. at 327, 106 S. Ct. at 2555, 91 L. Ed. 2d at 276. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

There is no issue of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986) (citation

omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2511-12, 91 L. Ed. 2d 202, 213-14 (1986). Summary judgment therefore must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; 106 S. Ct. at 2552, 91 L. Ed. 2d at 273; see also J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987) (holding that a "plaintiff will be out of court if he has not adduced sufficient evidence to get to a jury on every element of his case").

In order to meet its burden, the party moving for summary judgment need not "produce evidence showing the absence of a genuine issue of material fact"; it can instead merely "point out . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S. Ct. at 2554, 91 L. Ed. 2d at 275.

The burden on the non-moving party is more substantial. Fed. R. Civ. P. 56 (e)(2) states as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

To meet its burden, the non-moving party may use any type of evidentiary material "listed in Rule 56 (c), except the mere pleadings themselves"; this material need not, however, be "in a form that would be admissible at trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2553, 91 L. Ed. 2d at 274. While the non-moving party need not prove its case, it must show that there is a genuine issue for

11

trial; a "mere scintilla of evidence" or a "metaphysical doubt as to the material facts." is not sufficient. Anderson, 477 U.S. at 251, 106 S. Ct. at 2511, L. Ed. 2d at 213; Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356, 89 L. Ed. 2d at 552.

In deciding a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000) (quoting Armbruster v. Unisys Corp., 32 F.3d 777 (3d Cir. 1994)); see also Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (quoting Smith v. Pittsburgh Gage and Supply Co., 464 F.2d 870, 874 (3d Cir. 1972) (explaining that the district court must "resolve all inferences, doubts and issues of credibility against the moving party.") (citations omitted). The non-movant must, however, "present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue" for trial. McCabe v. Ernst &Young, LLP, 494 F.3d 418, 436-37 (3d. Cir. 2006) (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005)) (internal citations and quotations omitted); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695, 716 (1990) (holding that the purpose of Rule 56(e) is "not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). "Specious objects will not . . . defeat a motion for summary judgment, but real questions of credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof [] will." El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d. Cir. 2007). If the court is unable to render summary judgment on the entire action, it "should, to the extent practicable, determine what material facts are not generally at issue," and those facts "must then be treated as established in the action." Fed. R. Civ. P. 56 (d)(1).

## The Wrongful Death Act and Survival Statute

Plaintiffs seek judgment against the Defendants claiming that they negligently and/or recklessly caused the death of Ronald Holbrook pursuant to a duty of care owed to him under tort and contract law. Under Pennsylvania law, the family of the deceased are given the right to bring suit in such an action under the Wrongful Death Act and Survival Statute. The Wrongful Death Act, Act of December 20, 1982, P.L. 1409. No. 326, Art. II, § 201, 42 Pa. C.S.A. § 8301, provides in pertinent part:

> **(a) General rule.**--An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.
>
> **(b) Beneficiaries.**--Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

42 Pa. C.S.A. § 8301.

The Survival Statute, Act of July 9, 1976, P.L. 586, No. 142, § 2, 42 Pa. C.S.A. § 8302 provides: "All causes of actions or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."

13

As Plaintiffs properly allege negligence under the Wrongful Death Act and Survival Statute, they must satisfy all elements of a negligence action under Pennsylvania law. To prove a cause of action for negligence, Plaintiffs must prove that "the defendant[s] owed a duty of care to the plaintiff, the defendant[s] breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." Brown v. Philadelphia Coll. of Osteopathic Med., 760 A.2d 863, 868 (Pa. Super. 2000) (citing Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998)). "Absent a breach of duty, a negligence claim cannot be sustained. Marshall v. Port Auth. of Allegheny County, 568 A.2d 931 (Pa. 1990).

## I. Kimball's Motion for Summary Judgment

Plaintiffs' remaining allegations against Kimball are as follows:

26. On or before May 10th, 2004, The Defendant, L. Robert Kimball ("Kimball") and Associates, was negligent [stricken] in the following particulars.

a. [stricken]

b. In hiring, supervising, or contracting with New Enterprise, despite New Enterprise's extensive history of safety violations and injuries;

c. In permitting Woodham on the site;

14

d. [stricken]

e. [stricken]

f. [stricken]

g. [stricken]

h. [stricken][2]

i. Breach of contract;

j. In breaching its duty of care owed to Ronald Holbrook;

k. [stricken].

27. The negligent acts of Kimball were so willful, wanton and outrageous in character as to entitle the Plaintiffs to an award of

_____

[2]The Court notes that on July 13, 2007, this Court granted Kimball's Motion for Reconsideration with regard to Plaintiffs' failure to file a Certificate of Merit. Thereby, the Court dismissed Plaintiffs' professional negligence claims against Kimball and struck Subparagraphs 26 (a), 26 (d), 26(e), 26 (f), 26 (g), and 26 (h). Plaintiffs were granted twenty days to file a motion seeking reinstatement of those professional negligence claims. (Doc. No. 91.) On August 1, 2007, Plaintiffs filed a Motion for Extension of Time to file Certificate of Merit. (Doc. No. 98). On August 15, 2007, the Court denied Plaintiff's motion with prejudice. (Doc. No. 103.)

punitive or exemplary damages, to punish Kimball and to discourage

such conduct of others in the future.

(Doc. No. 62, ¶¶ 26-27).

New Enterprise and Woodham also have claims against Kimball for contribution and/or indemnity. (Doc. Nos. 65, 66).

### a. Duty to Holbrook

Generally, Plaintiffs assert that Kimball breached its duty of care to Holbrook. The determination of whether a duty exists in a particular case involves the weighing of several factors: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and the foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. Bilt-Rite Contractors Inc. v. The Architectural Studio, 866 A.2d 270, 281 (Pa. 2005). Duties can arise pursuant to contractual relationships or common law negligence law. Bilt-Rite, 866 A.2d at 288.

In the instant case, Plaintiffs and New Enterprise argue duties pursuant to both contract and tort law. With regard to the record pertinent to this motion, Kimball cites in support, and New Enterprise and Plaintiffs cite in opposition, two separate contracts between Kimball and the Air Authority. (Doc. No. 121, Ex A; Doc. No. 125, Ex. 1). The contract cited by New Enterprise, Woodham, and Plaintiffs is dated April 2002 and the contract cited by Kimball is dated August 5, 2003. Kimball claims that the contract of August 5, 2003 supersedes the contract of April 2002 and would be controlling with regard to the resolving of this motion. (Doc. No. 121, Ex. A). Therefore,

16

before the arguments of the parties can be addressed, a determination must be made as to which contract controls the obligations of Kimball at the time of the accident.

Kimball argues that an integration clause present in the August 5, 2003 contract causes that contract to be the full and complete agreement between Kimball and the Airport Authority and thus supersedes the prior agreement of April 2002. The integration clause of the August 5, 2003 contract reads as follows:

> 8.3.This    Agreement (consisting of 1 to 18, inclusive) together
> with the Exhibits and schedules identified above constitute the entire
> agreement between OWNER and ENGINEER and supersede all prior
> written or oral understandings. This Agreement and said Exhibits
> and schedules may only be amended, supplemented, modified or
> canceled by a duly executed written instrument.

(Doc. No. 121, Ex. A, ¶ 8.3).

Under Pennsylvania law, the interpretation of a contract and the application of the parol evidence rule has been set forth by the Pennsylvania Supreme Court as follows:

> Where the parties, without any fraud or mistake, have deliberately put
> their engagements in writing, the law declares the writing to be not
> only the best, but the only, evidence of their agreement.    All
> preliminary negotiations, conversations and verbal agreements are
> merged in and superseded by the subsequent written contract...and
> unless fraud, accident or mistake be averred, the writing constitutes
> the agreement between the parties, and its terms and agreements
> cannot be added to nor subtracted from by parol evidence.

Yocca v. The Pittsburgh Steelers Sports Inc., 854 A.2d 425, 436 (Pa. 2004) (citing Gianni v.

Russell & Co., 126 A. 791, 792 (Pa. 1924)).

In making the determination as to whether a writing constitutes the entire contract of the parties, the writing must be examined and "if it appears to be a contract complete within itself,

17

couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents the whole engagement of the parties . . . ." Id. In addition, when an integration clause is present which declares that a writing is to be the parties' entire agreement, this can be interpreted as "a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." Id. There are exceptions to the general rule that evidence of previous oral or written negotiations or agreements is inadmissible to explain or vary the terms of the contract. Id. at 437. Parol evidence may be introduced to vary a writing where a party avers that a term was omitted because of fraud, accident, or mistake or where a term in the contract is ambiguous. Id. The Court as a matter of law must determine whether a contract is ambiguous. "A contract is ambiguous if it is reasonably susceptible to more than one construction and capable of being understood in more than one sense." Hutchinson v. Sunbeam Coal Co., 519 A.2d 385 (Pa. 1986). "A contract is not rendered ambiguous by the mere fact that the parties do not agree on its proper construction." Sorbee Intern. Ltd. v. Chubb Custom Ins. Co., 735 A.2d 712, 717 (Pa. Super. 1999).

In the instant case, the April 2002 and August 5, 2003 contracts between the Air Authority and Kimball are very similar, but the later version struck many of the provisions relied upon by New Enterprise, Woodham, and Plaintiffs. Due to the integration clause at ¶ 8.3, the August 5, 2003 contract cannot be read to encompass any of the provisions of past agreements between Kimball and the Air Authority. The contract is not ambiguous in its language with regard to the August 5, 2003 Agreement superseding all prior written and oral understandings. Therefore, the

18

August 5, 2003 Agreement was controlling when the incident occurred on May 10, 2004. However, the August 5, 2003 Agreement did not define Kimball's contractual duties for negligent hiring and contracting; since those claims involve Kimball's actions at the time of the hiring process, the April 2002 contract would govern.

### b. Negligent Hiring or Contracting

Plaintiff claims that Kimball was negligent in hiring and/or contracting with New Enterprise due to New Enterprise receiving several citations on previous jobs from the Occupational Safety and Health Administration (OSHA). New Enterprise further claims that Kimball was negligent in hiring and/or contracting with Kronenwetter Electric, Inc. ("Kronenwetter"), the original electrical contractor that subsequently filed for bankruptcy before beginning work on the project. Kimball claims that the Plaintiffs and New Enterprise have failed to come forward with any evidence that Kimball owed a duty to Holbrook with regard to the hiring of or contracting with New Enterprise or Kronenwetter.

Both Plaintiffs and New Enterprise argue that Kimball's role in the reviewing of bids constituted a duty to hire the best candidate for the electrical work at the Bedford County Airport project. (Doc. No. 136, pp. 8-9, Doc. No. 133, pp. 15-18). In support of their argument, Plaintiffs refer to paragraph 84 of Plaintiffs' Responsive Concise Statement of Facts to suggest that "[p]rior to recommending New Enterprise to the Airport Authority as the milling/paving contractor, Kimball conducted its own research revealing that New Enterprise had an extensive history of safety violations." (Doc. No. 133, ¶ 84). While there is evidence that Kimball assisted in the Federally regulated bidding process which ended in the hiring by the Airport Authority of New

19

Enterprise, Plaintiff failed to cite to any part of the record to support this statement regarding

OSHA safety violations. Plaintiffs also cited a part of the Deposition Testimony of Richard Holes

in support of its allegations, but failed to include the full relevant portion of the testimony:

> Q: So how do you go about deciding who is going to do it?
>
> A: Once the design is completed, then we are required to follow federal regulations through the bidding of the plans - or, of the project to be constructed. That involves publicly advertising for bids, receipt and review of the bids.
>
> Q: Do you do that?
>
> A: We aid in that, yes.
>
> Q: Who - if you aid in it, who's primarily responsible?
>
> A: The owner receives the bids. We then aid the owner in the review of the bids.
>
> Q: Do you make recommendations?
>
> A: We make a recommendation based on the bids *as to the lowest bidder once we complete a review of the bids.*
>
> *Many times the bids are received with errors that can affect the outcome of the bids, so we have to review the bid for errors, and if there – once we do that, we make a recommendation to the owner and the funding agency that this contractor is the lowest bidder.*
>
> Q: *Who hired New Enterprise to be one of the contractors for the Bedford County Airport project?*
>
> A: *The Bedford County Industrial Park Authority, I believe, is their official name.*
>
> *Q: Who hired Bruce & Merrilees?*
>
> *A. Same.*

(Doc. No. 174, Ex. C, pp. 16-17) (emphasis added).

New Enterprise makes a similar argument, but suggests that Kimball negligently selected, Kronenwetter, resulting in the unnecessary delay in the completion of the duct bank construction, which in turn led to Holbrook being present at the construction site on the day that he was killed. (Doc. No. 136, 8-9). Before beginning work on the Bedford Airport Project, Kronenwetter declared bankruptcy which required the hiring of a different contractor, B&M. New Enterprise claims that this delayed the electrical portion of the project. (Doc. No. 136, pp. 8-9). New Enterprise suggests that Kimball had a contractual duty to evaluate Kronenwetter as a suitable electrical contractor pursuant to the April 2002 contract.[3] It cites to section 1.5.5 of the April 2002 contract:

> 1.5 Bidding or Preconstruction Phase.
>
> After authorization to proceed with the Bidding or Preconstruction Phase, ENGINEER shall:
>
> 1.5.5 Attend the bid opening, prepare bid tabulation sheets and assist OWNER in evaluating bids or proposals and in assembling and awarding contracts for construction, materials, equipment and services.[4]

---

[3]Due to the nature of New Enterprise's argument, there is obviously an issue of proximate cause. Under Pennsylvania law, when proposed negligence is so remote that the actor cannot be held liable for the harm that subsequently occurred, there is a lack of proximate cause. Brown v. Philadelphia Coll. of Osteopathic Med., 760 A.2d 863, 868 (Pa. Super. 2000).

[4]Since the claim of Plaintiffs is for negligent hiring and contracting, this is the only instance where the April 2002 contract will be considered. The duty in question here was only relevant at the time of the bidding process with New Enterprise and Kronenwetter, which the record indicates occurred prior to the August 2003 contract.

(Doc. No. 138, Ex. 3, 2). New Enterprise further cites to § 30-01 of the General Provisions of its own contract in support of its proposition.[5]

Therefore, New Enterprise and Plaintiffs together claim two separate duties with regard to the hirings for the Bedford County Airport Project, one based in contract and one based in tort. However, the contractual provisions relied upon by New Enterprise do not suggest that Kimball had a duty to evaluate the suitability of the electrical contractors. In fact, the contract only gives Kimball the duty to "assist OWNER in evaluating bids." (Doc. No. 138, Ex. 3, 2). Neither this nor the provisions of the contract gave Kimball a duty to find a safe and suitable contractor. No evidence has been presented that even suggests that Kimball had any knowledge of any unsuitability or background with regard to Kronenwetter or New Enterprise. Such evidence, even if presented, would not matter under the contract. The only information that Kimball reviewed was the contractors' bids and proposals. Therefore, Kimball did not have a duty pursuant to the April 2002 contract.

Plaintiffs argues that Kimball had a duty pursuant to § 411 of the Restatement (Second) of Torts. Pennsylvania courts have utilized § 411 of the Restatement (Second) of Torts when addressing claims for negligence in the hiring of a contractor.[6] Section 411 reads as follows:

[5]Although New Enterprise has attached several sections of the General Provisions to the end of the August 2002 contract between Kimball and the Air Authority, it failed to provide a full and complete copy of that contract from which the Court could determine the status of those provisions. Regardless, the August 5, 2003 contract would control here and pursuant to the integration clause at provision 8.3, the contract is inclusive of sections 1-18 and the exhibits discussed in the contract. The General Provisions do not fall within those boundaries. See also Affidavit of Richard Holes, Doc. No. 73, Ex. A.

[6]Section 411 of the Restatement Second of Torts has not been officially adopted by the Pennsylvania Supreme Court. It has, however been utilized is several Pennsylvania opinions.See Mentzer v. Ognibene, 597 A.2d 604 (Pa. Super. 1991), Lutz v. Cybularz, 607 A.2d 1089 (Pa. Super. 1992), and Leonard v. Com., 565 Pa. 101 (Pa. 2001).

22

§411 Negligence in Selection of Contractor
An *employer* is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor.

(a) to do work which will involve a risk of physical harm unless it is skillfully done, or

(b) to perform any duty which the employer owes to third persons.

Restatement (Second) of Torts, §411. (emphasis added).

Plaintiffs do not suggest that Kimball contracted with New Enterprise and in fact there is no evidence to that effect. Additionally, Plaintiffs suggest that New Enterprise had been cited on several occasions by OSHA and that Kimball had knowledge of these citations. However, Plaintiffs have provided no evidence in the record that OSHA cited New Enterprise nor that Kimball would have been aware of those citations. Nor is it able to be shown that Kimball in any way "employed" New Enterprise (or Kronenewetter); the April 2002 contract and the testimony of Richard Holes indicates that Kimball's participation in the bidding process was restricted to reviewing bids and proposals and recommending the lowest bidder to the Air Authority. The contract for New Enterprise's work and for Kronenwetter's work was between the Airport Authority and the contractor. Kimball was not a party to either of those contracts and was not an "employer" to either New Enterprise or Kronenwetter. Further, pursuant to Pennsylvania case law, Holbrook would not fall into the category of "third persons" contemplated by section 411.[7] Therefore, Plaintiffs cannot

---

[7] See Mentzer v. Ognibene, 597 A.2d 604 (Pa. Super. 1991). In Mentzer, an owner of property hired a general contractor to perform work at the site. While engaged as an employee of the general contractor, a carpenter fell down a hole cut in the floor for an internal stairway. With regard to the scope of the "third persons" terminology in § 411 the court stated "[w]e agree that the scope of section 411 is properly limited to claims by third persons other than employees of the negligent independent contractor

support a claim for negligent hiring when Kimball was not the employer and had no duty to recommend the safest electrical contractor.

## c. Negligent Supervision and Control of Safety

Kimball claims that a design engineer, architect, and inspector such as Kimball is under no duty to supervise or control construction to ensure the maintenance of safe conditions on a construction project. In support of its argument, Kimball cites to several cases for the proposition that absent an undertaking by contract or conduct, a design engineer such as Kimball is under no duty to supervise or control construction to ensure the maintenance of safe conditions on a project.

## I. Contractual Duty to Implement and Communicate Safety Plan

Plaintiffs and New Enterprise argue that Kimball is liable because it took on a contractual duty to assure safety pursuant to contract provisions 1.5.5, 1.5.7, 1.6.2.1, 1.6.2.3, and 2.3.6.1[8] of the August 2002 contract between the Air Authority and Kimball. New Enterprise further cites to the General Provisions of its own contract at 80-05 and 80-06.[9] In the alternative, Plaintiffs claim that Kimball is liable, not because of contractual duties, but because of conduct it undertook that would suggest it was taking on such a duty. (Doc. No. 133, p. 21).

---

itself." The court held that under § 411 the property owner was insulated from liability for negligence by its contractor and furthermore that the contractor and the contractor's employees were in the best position to provide for the protection of employees.

[8]The Court notes that contract provision 1.5.5 has been removed from the August 5, 2003 contract and 2.3.6.1 has been modified from the August 2002 contract to read "No Special Studies are anticipated under this project."

[9]No evidence of record suggests that General Provisions 80-05 and 80-06 were a part of the contract between Kimball and the Air Authority.

24

Under Pennsylvania law, the liability of a professional engineering corporation, contractual or otherwise, has been outlined in the case law. Generally, an engineer is not "under a duty to notify workers or employees of the contractor or subcontractors of hazardous conditions on the construction site . . . absent an undertaking by an architect, by contract or conduct." Young v. E. Eng'g and Elevator Co., 554 A.2d 77, 84 (Pa. Super. 1989).

In Marshall v. Port Auth. of Allegheny County, 568 A.2d 931 (Pa. 1990), a construction worker who was injured during a bridge demolition brought suit against the county port authority and the engineering firm retained by the authority for the project. The appellate court reversed the trial court's judgment entered against the engineering firm for negligence in its supervision of safety requirements. Id. at 933. The Pennsylvania Supreme Court affirmed. Id. The contractual relationship between the Port Authority and the engineer consisted of an initial agreement and a number of supplemental agreements. Id. at 936. In the initial agreement, provisions were in place that imposed duties with regard to the engineering firm planning, designing, engineering, and managing construction. Id. A supplemental agreement later eliminated all construction management duties. A still later agreement outlined the duties as follows "Provide field engineers, inspectors and support personnel to monitor the construction performed under Authority issued contracts, *to assure delivery of the specified systems and facilities in accordance with contract drawings and specifications.*" Id. (emphasis added).

Marshall also addressed the contract between the Port Authority and the general contractor which contained a provision for "Safety and First Aid Requirements" which provided that workers would not have to work under conditions that would pose a danger to their safety as determined by

25

the Occupational and Health Act of 1970. Id. The contract also provided that the engineer *may* stop

any operation that provided a hazard until the failure was remedied. Id. The Court discussed these

provisions and determined that Port Authority/Engineer contract did not provide for a duty on

behalf of the engineer to provide for safety. The decision turned on three facts: first, that the

engineer was not a party to the Port Authority/general contractor contract; second, that making the

engineer liable for safety would conflict with the provisions of the Port Authority/general

contractor contract giving *general contractor* the duty to supervise and direct the construction; and

third, that in reading all of the contract provisions together, the engineer's duties at the site were to

be passive. Id. The court noted, "the determinative question is not whether [the engineer] *could*

have acted to prevent the instant accident, but rather whether it had a *duty* to do so." Id. at 936

(italics in original).

Kimball was similarly situated to the engineers in Marshall. Through Kimball's contract

with the Air Authority, it was serving as a representative of the Air Authority in the respect that

they were assuring compliance with the contract documents.[10] (Doc. No. 121, Ex. A). Additionally,

---

[10]     1.6.2.1 ENGINEER shall make visits to the site at intervals appropriate to the various
stages of construction as ENGINEER deems necessary in order to observe as an
experienced and qualified design professional the progress and quality of the various
aspects of Contractor(s)' work. In addition, ENGINEER shall provide if authorized by
OWNER the services of a Resident Project Representative (and assistants as agreed) at
the site to assist ENGINEER and to provide more continuous observation of such work.
Based on information obtained during such visits and on such observations, ENGINEER
shall endeavor to determine in general if such work is proceeding in accordance with the
Contract Documents and ENGINEER shall keep OWNER informed of the progress of the
work.
                                      ***
1.6.2.3 The purpose of ENGINEER's visits to and representation by the Resident Project
Representative (and assistants, if any) at the site will be to enable ENGINEER to better
carry out the duties and responsibilities assigned to and undertaken by ENGINEER
during the Construction Phase, and, in addition by exercise of ENGINEER's efforts as an
experienced and qualified design professional, to provide for OWNER a great degree of

they disclaimed all liability for the safety of the workers of contractors. Taking the provisions of the Air Authority/Kimball contract and reading them in conjunction with the provisions of the Air Authority/B&M and Air Authority/New Enterprise, it was the contractors themselves that assumed responsibility for the safety of workers.[11] The August 5, 2003 contract did not contain a provision of the initial contract that dealt with a Safety and Phasing Plan to be designed by Kimball in an effort to keep the Airport in operation during the construction. Regardless, even if it had been included in the relevant contract, the provision focused upon keeping the airport operational rather

---

> confidence that the completed work of Contractor(s) will conform generally to the Contract Documents and that the integrity of the design concept as reflected in the Contract Documents has been implemented and preserved by Contractor(s). On the other hand, ENGINEER shall not, during such visits or as a result of such observations of Contractor(s)' work in progress, supervise, direct or have control over Contractor(s)' work nor shall ENGINEER have authority over or responsibility for the means, methods, techniques, sequences or procedures of construction selected by Contractor(s), for safety precautions and programs incident to the work of Contractor(s) to comply with laws, rules, regulations, ordinances, codes or orders applicable Contractor(s) furnishing and performing their work. Accordingly, ENGINEER can neither guarantee the performance of the construction contracts by Contractor(s)' nor assume responsibility for Contractor(s)' failure to furnish and perform their work in accordance with the Contract documents.

(Doc. No. 121, Ex. A).

[11]    General Provisions: 70-06.1 Safety and Protection. CONTRACTOR shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work: CONTRACTOR shall take all necessary precautions for the safety of and shall provide the necessary protection to prevent damages, injury or loss to:

> A. all persons on the Work site or who may be affected by the Work...
> ***
> 70.06-2 Safety Representative. Contractor shall designate a qualified and experienced safety representative at the site whose duties and responsibilities shall be the prevention of accidents and maintaining all supervising of safety precautions and programs. This person shall be CONTRACTOR's superintendent unless otherwise designated in writing by CONTRACTOR to OWNER.

(Doc. No. 121, Ex. B).

27

than the safety of contractors' workers. Hence, any arguments with regard to safety plans pursuant

to this provision are moot.

New Enterprise cites to its own contract in support of a duty to provide for safety on behalf

of Kimball.[12] They also claim that these provisions gave Kimball the duty to remove B&M from

site on the day of the incident for failing to use barricades, blockades, and cones. However, as

paralleled in Marshall, Kimball was not a party to the New Enterprise/Air Authority contract.

Therefore, Kimball cannot be bound by any purported duty contained therein. New Enterprise also

relies on provision 1.5.7 of the contract between Kimball and the Air Authority (the provision was

the same in both versions) to argue that Kimball had a duty to ensure the safety of Holbrook.[13] The

---

[12]     80-05 CHARACTER OF WORKERS METHODS AND EQUIPMENT.
CONTRACTOR shall, at all times, employ sufficient labor and equipment for
prosecuting the work to full completion in the manner and time required by the contract,
plans and specifications. All workers shall have sufficient skill and experience to
perform properly the work assigned them. Workers engaged in special work or skilled
work shall have sufficient experiences in such work and in the operation of the equipment
required to perform the work satisfactorily.

Any person employed by CONTRACTOR or by any subcontractor who, in the opinion of
the ENGINEER, does not perform work in a proper and skillful manner or is intemperate
or disorderly shall, at the written request of ENGINEER, be removed forthwith by
CONTRACTOR or subcontractor employing such person, and shall not be employed
again in any portion of the work without the approval of the ENGINEER...

80-06 TEMPORARY SUSPENSION OF WORK
ENGINEER shall have the authority to suspend the work wholly or in part for such
period or periods as ENGINEER may deem necessary, due to unsuitable weather or such
other conditions as are considered unfavorable for the prosecution of the work or for such
time as it is necessary due to the failure on the part of the CONTRACTOR to carry out
orders given or perform any or all provisions of the contract...

(Doc. No. 138, Ex. 3).

[13]     1.5.7 Conduct a preconstruction conference, as required by the PennDOT Bureau of
Aviation, to formally review all requirements of the project, safety provisions and
applicable regulations.

(Doc. No. 121, Ex. A).

28

suggestion that reviewing safety provisions at a preconstruction conference in some way gives Kimball the duty to implement and monitor a construction safety plan is ill-conceived. The safety and phasing plan provision from the April 2002 contract was removed; therefore, an argument that contract comments regarding safety elsewhere in the contract gave rise to a duty for Kimball to determine, relay, and carry out a plan is without merit.

### ii. Contractual Duty to Oversee Sequencing/Phasing

New Enterprise argues that Kimball had a duty of care to assure that the duct bank construction was completed at least seven days before New Enterprise began paving operations on May 11, 2004. By implication, New Enterprise argues that this caused B&M employees to be on the site on the day of the accident, which led to the death of Holbrook. New Enterprise suggests that Kimball had this duty to ensure timely construction because of Kimball's duty to perform their contractual undertakings in such a manner that third persons to the contract would not be injured. In support of New Enterprise's argument, it relies on provision 2.3.6.1 of the August 2002 contract between Kimball and the Air Authority, provisions 1.6.2.1 and 1.6.2.3, and General Provision 50-04.2 of its own contract with the Air Authority.[14]

As stated above, provision 2.3.6.1 did not appear in the same form in the August 5, 2003 contract and therefore would not govern New Enterprise at the time of the accident. General Provision 50-04.2 was a part of the B&M/Air Authority and New Enterprise/Air Authority contracts and therefore, Kimball was not bound by it. Therefore, the only contractual duty Kimball

---

[14]Once again, New Enterprise attempts to assert that General Provision 50-04.2 is a part of the Kimball Contract with the Air Authority and for the reasons stated in Footnote 5, we find that this is not the case.

could have would be pursuant to 1.6.2.1 and 1.6.2.3. See Footnote 10. While New Enterprise cites to the minutes of meetings and deposition testimony in support of an argument that Kimball had a duty to monitor the sequencing, the record does not show that Kimball had a duty to manage the sequencing between the contractors. New Enterprise cited to the deposition testimony of Keith Vasas of Kimball, who admitted that Kimball was in the best position to make sure that individual contractors followed the sequencing set forth in the plans and specifications. However, Vasas also testified that Kimball w as not in the best position to determine whether all contractors were following sequences in regard to each other:

> I'd say Kimball was in the best position to determine if each individual contractor was following the sequence, not necessary following sequences between each other, because you identified three parties, but individually if they were following - if the paving contractor was following that sequence, I'd say individually we would be in the best position to determine if they were following it on that individual basis per contract.

(Doc. No. 138, Ex. 8, pp. 44-46). Regardless, even if Kimball were in the "best" position to pursue any course of conduct, that does not give rise to a contractual duty to manage phasing and sequencing.

### iii. Duty Pursuant to Conduct at the Site

Plaintiffs alternatively claim that Kimball is liable, not because of contractual duties, but because of a duty arising out of Kimball's conduct. (Doc. No. 133, p. 21). Plaintiffs claim that Kimball was best able to coordinate the work of the various contractors to prevent conflicts and undertook a duty to do so because of its intense involvement in the construction process. Id. Plaintiffs cite to Woodham's expert's report in support of their argument that a duty emerged

30

because Kimball was in the "best" position to coordinate efforts among the contractors. Id. Plaintiffs also claim that Kimball's regular presence at the site gave rise to a duty because Kimball's presence was more regular than that of the engineers in Marshall, Herceg, and Young as cited by Kimball.

Plaintiffs argue that the Court should forgo adopting the rule in Marshall as discussed above, and instead apply the ruling in Heath v. Huth Eng'rs, Inc., 420 A.2d 758 (1980). Plaintiffs cite to the Second Restatement of Torts, which was utilized in Heath:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:
>> (a) his failure to exercise reasonable care increases the risk of harm, or
>> (b) he has undertaken to perform a duty owned by the other to the third person, or
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Rest. (Second) of Torts § 324. In Heath, the Pennsylvania Superior Court found a consulting engineer to be liable for the injuries incurred by a sewage worker due to the engineer undertaking a duty "to supervise the work, periodically inspect it, and assist in safeguarding the owner against defects and deficiencies on the part of the contractors" through his regular presence at the site. Heath, 420 A.2d. at 759. However, the court notes that Heath was decided before the Supreme Court ruling in Marshall; furthermore, the Pennsylvania Commonwealth Court has been unwilling to follow the Heath case because they found the discussion "too cursory and conclusory to serve as persuasive precedent." Dunkle v. Middleburg Mun. Auth., 842 A.3d 477 (Pa. Commw. Ct. 2004).

31

The Heath opinion is limited in its discussion of the facts and states little of the contractual provisions upon which its holding turns; hence, the Court does not find it persuasive here. Furthermore, pursuant to the Pennsylvania Supreme Court's ruling in Marshall, Plaintiffs' argument that Kimball was in the best position to monitor on-site safety because of its undertakings has no consequence. Kimball's regular presence at the site does not inherently give rise to a duty. The Court further notes that since Kimball did not have a duty to monitor, execute, or enforce a safety plan, Kimball did not have a duty to convey this plan to Woodham. Therefore, Kimball did not have a duty to keep him off of the site.

## c. Breach of Contract/Third-Party Beneficiary Status

Plaintiffs further claim that Holbrook was a third-party beneficiary to the contract between Kimball and the Air Authority, and hence any duties undertaken through that contract would necessarily flow to Holbrook. A cause of action based on third-party beneficiary status has historically been one of narrow application. Since Holbrook was not a party to the contract between Kimball and the Air Authority, any duty on behalf of Kimball to Holbrook based in contract would be because of third-party beneficiary status. Initially, causes of action based on third-party beneficiary status were limited to cases in which the contracting party's intention to benefit a third party was affirmatively expressed in the contract. See Spires v. Hanover Fire Ins. Co., 70 A.2d 828 (Pa. 1950) (plurality opinion). The Court notes that Kimball's Agreement with the Air Authority specifically excluded any non-parties from third-party beneficiary status.[15] However, over time, the

---

[15]     § 7.5.3 Nothing in this Agreement shall be construed to give any rights or benefits in this Agreement to anyone other than OWNER and ENGINEER, and all duties and responsibilities undertaken pursuant to this Agreement will be for the sole and exclusive benefit of OWNER and ENGINEER and not for the benefit of any other party. (Doc. No.

32

class of third-party beneficiaries has been broadened through the adoption of section 302 of the

Restatement (Second) of Contracts. See Scarpitti v. Weborg, 609 A.2d 147 (Pa. 1992). Section 302

states:

> Intended and Incidental Beneficiaries:
> (1) Unless otherwise agreed between promisor and promisee, a
> beneficiary of a promise is an intended beneficiary if recognition of a
> right to performance in the beneficiary of a promise is appropriate to
> effectuate the intentions of the parties and either
>> (a) the performance of the promise will satisfy an obligation
>> of the promisee to pay money to the beneficiary; or
>> (b) the circumstances indicate that the promisee intends to
>> give the beneficiary the benefit of the promised performance.
> (2) An incidental beneficiary is a beneficiary who is not an intended
> beneficiary.

Restatement (Second) of Contracts § 302 (1979). In Scarpitti, the Supreme Court of Pennsylvania

cited the rule for incidental beneficiaries:

> [A] party becomes a third party beneficiary only where both parties
> to the contract express an intention to benefit the third party in the
> contract itself...*unless* the circumstances are so compelling that
> recognition of the beneficiary's right is appropriate to effectuate the
> intention of the parties, and the perf ormance of the promise will
> satisfy an obligation of the promise to pay money to the beneficiary
> or the circumstances indicate that the promisee intends to give the
> beneficiary the benefit of the promised performance.

Scarpitti, 609 A.2d at 150. Plaintiff has failed to present evidence that Kimball intended to give

Holbrook the benefit of any promise made on its behalf.

Plaintiffs alternatively argue that Kimball failed in its duty to perform its contract in such a

manner so as to not injure third parties. In Farabaugh v. Pa. Turnpike Comm'n, 911 A.2d 1264

(2006), the wife and adminstratrix of the estate of a dump truck driver brought suit against the

173, Ex. 2).

33

Pennsylvania Turnpike Commission and the construction manager of a highway construction project. The court found that the construction manager had positively assumed the responsibility to inspect and supervise the safety procedures on the work site through their contract with the Pennsylvania Turnpike Commission to "develop, implement, maintain and monitor a comprehensive project safety/insurance program." Id. at 1282. The truck driver was not a party to the contract between the construction manager and the PTC. However, the court further found that "it was foreseeable that a failure to perform properly the active safety role assumed by [the construction manager] under its contract with PTC could result in injuries to workers on the site. Accordingly, we hold that [the construction manager] owed a duty to perform its safety obligations under its contract with PTC so as not to injure Decedent." Id. at 1284.

In the instant case, we have not found that Kimball has assumed any duty with regard to a safety plan, safety monitoring, or safety inspections. Kimball had no duty, and it was not foreseeable that any of Kimball's actions would result in injuries to Holbrook. Additionally, the Kimball/Air Authority contract included a specific provision stating the intent of the parties not to benefit third parties through their contract. Therefore, Holbrook could not be a third-party beneficiary to the contract between Kimball and the Air Authority. Since the contract lacked any safety obligations, there is insufficient support behind the argument that Holbrook should be a beneficiary.

### d. Punitive Damages

As the Court found that Plaintiffs have not made out a claim of negligence against Kimball,

Plaintiffs' claim for punitive damages cannot survive. Therefore, Kimball's motion for summary

judgment will be granted in its entirety.

## II. New Enterprise's Motion for Summary Judgment

Plaintiffs' remaining allegations against New Enterprise are as follows:

> 24. On or before May 10[th], 2004, the Defendant, New Enterprise Stone and Lime Inc. ("New Enterprise") by and through its agents or employees, including but not limited to Chris Schieler and Joseph George Harper, Jr., was negligent [stricken] in the following particulars:
>
>> a. In instructing Woodham to proceed forward in the dump truck when Holbrook was helpless in the path of the truck.
>>
>> b. In failing [sic] assure that the area ahead of Woodham was clear before instructing him to proceed;
>>
>> c. In arranging the site in such a way that vehicle traffic was directed through areas in which defenseless personnel were working;
>>
>> d. In failing to arrange the worksite in such a manner that vehicle traffic was separated from areas in which personnel were working who could not reasonably be expected to look out for such traffic;
>>
>> e. In permitting Woodham and his truck on the site;
>>
>> f. In failing to communicate with Woodham and instruct Woodham on the activities at the site and safe routing around the site for his truck;
>>
>> g. In failing to adhere to the standard of care for a professional contractor in New Enterprise's position;

35

h. In failing to institute adequate policies and procedures to insure a safe site;

i. In failing to adhere to applicable safety regulations, whether state or federal;

j. In failing to adhere to applicable industry standards and codes;

k. Breach of contract;

l. Pursuant to the Court's order further specifying this allegation, the Plaintiff's state as follows:

> 1. A Contract existed between the Defendant architects, Kimball, and the Bedford County Airport, the owner of the worksite (said contract is not attached hereto inasmuch as the parties are already in possession of the same), specifying inter alia, the work to be done for the Bedford County Airport by Kimball (upon information and belief, said contract is designated "Agreement for Professional Services between Kimball and Bedford County Air Industrial Authority February, 2002, Revised April 2002" and was supplemented on multiple occassions after its execution);

> 2. Another Contract existed between the Defendant, Kimball and the Defendant, New Enterprise (said contract is not attached hereto inasmuch as the parties are already in possession of the same), specifying, inter alia, the work to be done for Kimball by New Enterprise;

> 3. Said contracts provided for assumption of responsibility for safety at the jobsite by New Enterprise on behalf of Kimball;

> 4. Nevertheless, Kimball's duty regarding safety at the worksite may only be shared and not delegated in its entirety pursuant to Pennsylvania and federal law, therefore Kimball retained and New Enterprise

36

assumed responsibility for safety at the worksite
pursuant to the contracts and the applicable law;

5. The Plaintiffs' decedent, Ronald Holbrook was a
third-party beneficiary of the contracts between
Kimball and the Bedford County Airport and between
Kimball and New Enterprise;

6. By breaching their respective duties to ensure a safe
worksite, as alleged in this Amended Complaint,
Kimball and New Enterprise breached a duty to
Plaintiff's decedent, the third-party beneficiary,
causing damages to him including death and pre-death
pain and suffering as described herein, damages for
which the Plaintiffs herein may lawfully sue.

l. In breaching its duty of care owed to Ron Holbrook;

m. [stricken]

25. The negligent acts of New Enterprise were so willful, wanton,
and outrageous in character as to entitle the Plaintiffs to an award of
punitive or exemplary damages, to punish New Enterprise and to
discourage such conduct by others in the future.

### a.    Independent Contractor Status of Woodham, Harper Jr., and Sechler

New Enterprise moves for summary judgment as to all claimants, claiming that as a matter

of law, Sechler (incorrectly referenced as Schieler in the complaint) and Woodham are independent

contractors. New Enterprise also claims that Harper Jr. was an employee of B&M and not New

Enterprise. Under Pennsylvania law, "[t]he employer of an independent contractor is not liable for

physical harm caused to another by an act or omission to the contractor or his servants." Ortiz v.

Ra-El Dev. Corp., 528 A.2d 1355, 1357 (Pa. Super. 1987). When there is a factual dispute as to the

agency relationship between two parties, then "it is the function of the jury to determine the precise

nature of the relationship between the parties." Green v. Indep. Oil Co., 201 A.2d 207, 210 (Pa.

1964). If no factual dispute exists, it is a question for the court. Id. Under common law agency principles, several factors must be taken into consideration to determine whether a relationship is one of employer/employee or independent contractor/owner:

> Control of the manner of work to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

Hammermill Paper Co. v. The Rust Eng'g Co., 243 A.2d 389, 392 (Pa. 1968).

The designation of a party in a contract as an independent contractor is not conclusive as to the status of that party as an independent contractor. Rodgers v. P-G Publ'g Co., 166 A.2d 544, 546 (Pa. Super. 1961). "The characteristic of the employee relationship is that the master controls not only the result of the work but has the right to direct the way in which it shall be done, whereas the characteristic of the independent contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result." Id. at 546. Actual control or direction over the work done is not a necessity in this analysis. Shay v. Flight C Helicopter Servs., Inc., 822 A.2d 1, 14 (Pa. Super. 2003). Instead, it is the right to control rather than the exercise of that control that is determinative. Id.

In the instant case, Plaintiffs alleged that the relationships between New Enterprise and two truckers, Sechler and Woodham, and the electrical worker, Harper Jr., was that of employee/employer. Although Plaintiffs asserted that Harper Jr. was an employee of New Enterprise in their complaint, Plaintiffs have stated in their brief that the insertion of Harper Jr.'s

38

name was a typographical error and that the complaint was actually intended to include a claim for vicarious liability for the actions of Woodham. New Enterprise was aware through the entirety of the discovery process of a vicarious liability claim for the actions of Woodham and the sub-paragraphs of ¶ 24 refer to the behavior of New Enterprise with regard to Woodham not Harper Jr. Hence, this Court will not find that Plaintiffs have failed to state a claim for vicarious liability with regard to the actions of Woodham, and will instead proceed on this issue on the merits.

The Court will now address whether New Enterprise, under its contracts with Woodham and Sechler, or by and through its actions, exercised a right to control over Woodham and Sechler so that there is a question of fact as to their employment status. The Indemnification Agreements between Woodham and New Enterprise and Sechler and New Enterprise state that Woodham[16] and Sechler[17] are both independent contractors of New Enterprise. However, the fact that an individual is named as an independent contractor in a contract is not controlling. Therefore, the conduct of the parties must be examined.

Both Woodham and Sechler were truck drivers that were under contract with New Enterprise. In Dugan v. Niglio, a truck driver backed into an automobile driver by George Dugan.

---

[16]The contract states as follows:

WHEREAS, Michael S Woodham, part of the first part, **is an independent contractor** performing services for and upon demand of New Enterprise Stone & Lime Co., Inc., party of the second part, consisting of hauling manufactured materials at various locations. (Doc. No. 125, Ex. 7 )(emphasis added).

[17]The contract states as follows:

WHEREAS, Christopher P. Sechler, party of the first part, **is an independent contractor** performing services for and upon demand of New Enterprise Stone & Lime Co., Inc., party of the second part, consisting of hauling manufactured materials at various locations. (Doc. No. 125, Ex. 8 ) (emphasis added).

39

258 A.2d 501, 502 (Pa. 1969). Dugan brought an action against the truck driver, the welding company with which he was contracting, and the Fort Pitt Bridge Works. Id. A nonsuit was entered in favor of the welding company on the grounds that the plaintiff's evidence was insufficient to warrant the submission to the jury of the question of Niglio's employee status. Id. In favor of its argument that Niglio was an employee of the welding company, the plaintiff relied on the fact that he had been hauling and delivering materials five days a week for the welding company for over twenty years. Id. However the Pennsylvania Supreme Court affirmed the decision below citing evidence of Niglio's independent contractor status. Id. The Court relied on the fact that Niglio owned his truck, had his own PUC permit, paid for oil and gas himself, and was compensated on a mileage and tonnage basis. The court also relied on the fact that "Niglio testified that he was not subject to the company's control and would not necessarily follow the company's directions . . . as he knew more about business than they did." Id. at 504.

In affirming the lower court's decision, the Pennsylvania Supreme Court stated:

> The general rule is that the driver of a truck engaged to do hauling is an independent contractor if it appears that he owned the truck which he himself drove and kept within his own control, storing it where he desired, paying all expenses incident to its operation including the cost of oil and gasoline, that he was paid at a fixed rate for each part or unit of the job performed, and that he was not subject to orders of the employer except as to the place of loading and unloading.

Johnson v. Angretti, 73 A.2d 666, 669 (Pa. 1950)

In the instant case, it is clear from the record that Woodham owned his own truck, paid for his own oil, gas, and maintenance, stored his truck at his house or a garage where maintenance was performed, and purchased insurance for the truck. (Doc. No.125, Ex. 7). It is also clear that

40

Woodham determined the route to take between the quarry and the job site and that it was his decision to park in crossover 3 while waiting for his turn at the milling machine. (Doc. No.125, Ex. 7). No record has been proffered with regard to how Woodham or Sechler were paid.

With regard to Woodham or Sechler being subject to the orders of New Enterprise, the Plaintiffs and Woodham have cited to the record to indicate that the truck drivers were subject to the requisite control. During his deposition, Richard Delozier, the on-site foreman of New Enterprise, testified to the situation regarding the trucks on the day of the incident and to several hypothetical situations:

> Q: Did you make any inquiry of Mr. Miller regarding the coordination of the haulers who were going to be hauling away the milled asphalt?
>
> A. No.
>
> Q. These haulers that were hauling the asphalt away for New Enterprise at the Bedford Airport, were they permitted to drive anywhere they wanted?
>
> A. As safety would allow. I mean, if somebody's working in there, they shouldn't be trying to go through that area.
>
> And it very well could be why I got involved and said, you know, we need to find another place to get through there, you know, other than where we were coming in at, so...
>
> Q. So you would have the ability to direct them where to go, but absent that direction they could go where they wanted; is that fair to say?
>
> A. If they would have asked me, I would try to direct them where they would need to go or whatever, yeah.

I mean I wouldn't necessarily just go and tell them. I really wasn't much involved but we could have gone to a different area.

\*\*\*

Q. I understand that wasn't your job, but maybe I should ask you: Somebody from New Enterprise could have done that, could have directed these trucks and said, "Don't go to these areas because there are going to be men working on the ground there"; correct?

A. I would think so.

\*\*\*

Q. My question, though, is: New Enterprise had the authority, had it chosen to do so, to tell those truckers where they needed to go for a staging area to avoid conflict with other trades at the site?

A. Well, they work for us, so, yeah, I would say so.

\*\*\*

Q. My question is: If an established crossing point was going to have been dedicated, if you will, and the truckers were going to be told, "This is where you're going to cross today," who would have been the person to designate that crossing point?

A. I would say either myself, Dave Lancendorfer, anybody from the company.

\*\*\*

Q. Well, you saw [Woodham] parked next to you?

A. Yes.

Q. Did you think it was an unsafe place for him to be parked?

A. No, I didn't see any reason for that.

Q. If you felt that was a dangerous or an unsafe place to park, did you have the authority to tell him to move?

42

A.    Yes.

Q.    And you never directed Mr. Woodham to move from that spot
      at crossover B; correct?

A.    I didn't see any reason to.

(Doc. No. 140, Ex. M, pp. 27-28, 101, 107, 111, 154).

Plaintiffs and Woodham also rely on the depositions of Brian Robeson and Geoffrey Clarke,

the corporate representative of New Enterprise. Robeson testified to New Enterprise's role in

designating a dump site:

Q.    Right. And I guess that's what I'm getting at is who would
      typically be in charge of making that designation?

A.    It would have to be either a superintendent or someone in the
      chain of command.

Q.    It would be someone from New Enterprise's milling
      operation; correct?

A.    Yes.

Q.    Would be the one to say this is where we are going to dump
      and this is where you are going to go, or you're going back to
      the quarry or you're going to stay here?

A:    Someone had to designate that when they had to dump.

(Doc. No. 140, Ex. G, p. 23). Clarke testified similarly to Delozier with regard to parking in the

crossovers:

Q.    If Mr. Delozier had told the drivers not to use any of the
      particular crossovers on the airport site, you would expect
      them to follow that direction; is that correct?

A.    Yes I believe the truckers would follow that direction.

43

(Doc. No. 140, Ex. L, p. 16).

This testimony suggests that New Enterprise had the right to indicate to Woodham and Sechler where to enter the site, where to park or "stage" while at the site, where to dump the millings that they were hauling from the site, and where to move if New Enterprise had safety concerns with regard to their location. The Court finds that this testimony is enough to raise a question of fact as to whether the right to direct Sechler and Woodham's behavior in this manner subjected them to the control of New Enterprise with regard to safety and maneuvering on the site. This is especially so since the court in Niglio, in finding the driver to be an independent contractor, relied on the fact that the driver specifically testified that he would not follow the directions of the company. There is no such testimony from Woodham or Sechler in this regard and in fact the testimony of Delozier, Robeson, and Clarke suggests that they would expect them to follow direction. Therefore, under the standards of Niglio and An gretti, the question of Sechler and Woodham's independent contractor status is one for the jury.

### b.    Duty to Holbrook

New Enterprise makes three arguments with regard to its lack of a duty to Holbrook. First, New Enterprise claims that it delegated the hauling of the millings to independent hired haulers, negating any duty for Sechler and Woodham's behavior. Under the same principle, New Enterprise argues that since it delegated hauling duties to Woodham and Sechler, New Enterprise does not have any duty under federal and state safety regulations. As the Court has already addressed, the independent contractor status of the two drivers raises a question of fact. Therefore, the Court will not address New Enterprise's argument in this regard; even if Woodham and Sechler are found to

44

be independent contractors of New Enterprise, further factual questions emerge as to whether safety responsibilities were in fact delegated. While New Enterprise may have delegated some hauling duties to Woodham and Sechler, it is not clear that New Enterprise also delegated safety responsibilities for the site. Second, New Enterprise argues that B&M had control over the electrical work at crossover 3 and was therefore in the "best position to appreciate the nature, extent, and timing of its activities and take appropriate precautions for the safety of its employees." (Doc. No. 123, p. 15). Third, New Enterprise claims that it did not have a duty to establish a traffic plan at the Bedford County Airport and is therefore not liable. Woodham joins in the second and third arguments of New Enterprise.

Plaintiffs contend that New Enterprise had a duty to Holbrook pursuant to the New Enterprise/Air Authority contract. Section 70-06.1 of the contract provides as follows:

> **70-06.1 Safety and Protection.** CONTRACTOR shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work: CONTRACTOR shall take all necessary precautions for the safety of and shall provide the necessary protection to prevent damage, injury or loss to:
>
> A. all persons on the Work site or who may be affected by the Work;
>
> B. all the Work and materials and equipment to be incorporated therein, whether in storage on or off the site; and
>
> C. other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures, utilities and removal, relocation or replacement in the course of construction.
>
> CONTRACTOR shall comply with all applicable Laws and Regulations of any public body having jurisdiction for safety of persons or property or to protect them from damage, injury or loss;

45

and shall erect and maintain all necessary safeguards for such safety and protection. CONTRACTOR shall notify owners of adjacent property and of Underground Facilities and utility owners when prosecution of the Work may affect them, and shall cooperate with them, in the protection, removal, relocation, and replacement of their property. All damage, injury or loss to any property referred to above caused, directly or indirectly, in whole or in part, by CONTRACTOR, any Subcontractor, Supplier or any other person or organization directly or indirectly employed by any of them to perform or furnish any of the Work or anyone for whose acts any of them may be liable, shall be remedied by CONTRACTOR (except damage or loss attributable to the fault of Drawings or Specifications or to the acts of omissions of OWNER or ENGINEER or ENGINEER's Consultant or anyone employed by any of them may be liable, and not attributable, directly or indirectly, in whole or in part, to the fault or negligence of CONTRACTOR or any Subcontractor, Supplier or other person or organization directly or indirectly, employed by any of them.) CONTRACTOR's duties and responsibilities for safety and for protection of the Work shall continue until such time as all the Work is completed and ENGINEER has issued a notice to OWNER and CONTRACTOR that the work is acceptable (except as otherwise expressly provided in connection with Substantial Completion.)

(Doc. No. 121, Ex. B). New Enterprise argues that this provision was not meant to benefit third

parties; New Enterpise cites to a separate contractual provision that states:

> 70-12 THIRD PARTY BENEFICIARY CLAUSE. It is specifically agreed between the parties executing the Contract that it is not intended by any of the provisions of any part of the Contract to create the public or any member thereof a third party benefic iary or to authorize anyone not a part to the Contract to maintain a suit for personal injuries or property damage pursuant to the terms or provisions of the contract.

(Doc. No, 125, Ex. 3).

Section 70-12 gives rise to obvious interpretational issues. In particular, the following

phrase is unclear: "create the public or any member thereof a third party beneficiary or to authorize

anyone not a part to the Contract . . . ." The contract provides no definition for the terms "public or any member thereof" and "anyone not a part to the Contract." It is possible that "public or any member thereof" was not meant to include "all persons on the Work site or who may be affected by the Work," because Section 70.06-1 clearly provides that New Enterprise, "shall provide the necessary protection to prevent damage, injury or loss to . . . ."

In Scarpitti v. Weborg, 609 A.2d 147 (Pa. 1992), purchasers of lots in a subdivision brought action against the subdivision architect seeking damages for arbitrary enforcement of subdivision restrictions. The subdivision restrictions were part of an implied contract between the developer and the architect. Scarpitti, 609 A.2d at 151. The lot purchasers were not named parties to the contract. However, the Supreme Court of Pennsylvania found that the lot purchasers were intended third-party beneficiaries because "the promisee inted[ed] to give the beneficiary the benefit of the promised performance" as the purpose of the agreement was to "make the lots more attractive to prospective purchasers by assuring that other homeowners in the subdivision would be required to abide by the recorded subdivision restrictions." Id. The contract at issue in Scarpitti did not include any clause that explicitly denied third parties rights under the contract.

Under Pennsylvania contract law, ambiguous terms or clauses are construed against the drafter. See Prudential Prop. and Cas. Ins. Co. v. Sarnto, 903 A.2d 1170, 1177 (Pa. 2006). It is unclear from the record in this case whether New Enterprise had a role in drafting the contract with Air Authority. Regardless, the terms of these two provisions are ambiguous and must be construed by the Court. New Enterprise and the Air Authority intended to give "all persons on the Work site" the benefit of safe workmanship. Such an intention conflicts with any attempt to utilize the Third-

Party Beneficiary Clause to strip all persons of their rights under the contract. Hence, the Court will construe "public or any member thereof" to exclude "all persons on the Work site who may be affected by the Work." As the Court construes the terms of the contract in this manner, it also finds that "all persons on the Work site who may be affected by the Work" were intended third-party beneficiaries of the contract and therefore were "a part[y] to the Contract." Therefore, Holbrook, as a worker on the site, could properly bring suit for injuries under the contract between the Air Authority and New Enterprise.

New Enterprise also argues that it was not negligent in the performance of its contract and therefore, Holbrook has no claim. New Enterprise points out that other entities have duties that supercede any duties that New Enterprise may owe. See Farabaugh v. Pa. Turnpike Comm'n, 911 A.2d at 1283-84 ("[W]e conclude that it was foreseeable that a failure to perform properly the active safety role assumed by Trumbull under its contract with the PTC could result in injuries to the workers on the site. Accordingly, we hold that Trumbull owed a duty to perform its safety obligations under its contract with PTC so as not to injure Decedent.") However, New Enterprise fails to show how the specific act that caused the accident could have been entirely the fault of other entities. Woodham parked in the course of waiting for his turn, noticed the B&M individuals working nearby, and failed to check in front of his truck before starting towards the runway. It is uncertain how these actions could completely be the fault of other entities. B&M's failure to put up barricades or warning signs, as provided for in their contract with the Air Authority, does not extinguish the fault of New Enterprise. New Enterprise also fails to show how the Airport Authority's duty to provide a traffic and safety plan for the coordinating of work and air traffic

gives rise to a duty to coordinate traffic between contractors when no air traffic is present.[18] New Enterprise did not provide the air traffic/construction plan; even so, the airport was closed on the day of the incident, and hence air traffic was not an issue. Therefore, New Enterprise has failed to show that its safety obligations were in some way negated by the other entities present at the site.

### c. Punitive Damages Claim

In their Amended Complaint, Plaintiffs make a claim for punitive damages against New Enterprise. "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984). These damages must also be based on malicious, wanton, reckless, or indifferent conduct. Id. at 747-48. "Further, one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties . . . ." Id. (internal citations omitted). While it may be possible for a jury to find that New Enterprise breached a duty to Holbrook, the record does not support the possibility of a jury finding that New Enterprise acted with the necessary state of mind to support a claim of punitive damages. Therefore, Plaintiffs' punitive damages claim against New Enterprise is dismissed.

### III. B&M's Motion to Dismiss Third-Party Complaints

### a. Legal Standard for Motion to Dismiss

---

[18]    4.4 (h) Construction Vehicle Traffic - With respect to Vehicle Traffic - With respect to vehicular traffic, aircraft safety during construction is likely to be endangered by four principal causes: increased traffic volume, nonstandard traffic patters, vehicles without radio communication and marking, and operators untrained in the airport's procedures. Because each construction situation differs, airport management must develop and coordinate a construction vehicle traffic plan with airport users, air traffic control and the appropriate construction engineers and contractors. This plan, when signed by all participants becomes a part of the contract. The airport operator is responsible for coordinating and enforcing the plan. (Doc. No. 125, Ex. 3).

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12 (b)(6):

> [T]he district court [is] required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing in the light most favorable to the non-movant. Rocks v. City of Philadelphia, 868 F. 2d 644, 645 (3d Cir. 1989); D.P Enters., Inc. V. Bucks County Community College, 725 F.2d 943, 944 (3d Cir. 1984). In determining whether a claim should be dismissed under Rule 12 (b)(6), a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record. Moreover, a case should not be dismissed for failure to state a claim unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229 [, 2232-33, 81 L. Ed. 2d 59] (1984); D.P. Enters., 725 F.2d at 944.

Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). The defendant bears the burden to demonstrate that the complaint fails to state a claim. Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

In deciding a Rule 12 (b)(6) motion to dismiss, a court does not have to accept or give credit to "bald assertions," "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law," or "sweeping legal conclusions case in the form of factual conclusions." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 & n.8 (3d Cir. 1997) (citations omitted); see also Pa. House, Inc. v. Barrett, 760 F. Supp. 439, 449-50 (M.D. Pa. 1991).

In considering a motion to dismiss, a court decides only whether the plaintiff is entitled to offer evidence to support the claims. See Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

[D]ismissal under Rule 12 (b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleadings. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim.

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) (footnotes omitted). In the case *sub judice*, the Court cannot assume that Plaintiffs can prove any fact that is not alleged. City of Pittsburgh v. West Penn Power Co., 137 F.3d 256, 263 n. 13 (3d Cir. 1998) citing Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 902, 74 L.Ed. 2d 723, 731 (1983).

The Court notes at the offset that since Kimball's Motion for Summary Judgment is granted in its entirety, any of its claims against B&M for indemnification or contribution are moot. Therefore, the Motion will be addressed accordingly.

In Counts I and II, Woodham and New Enterprise have stated claims for negligence, vicarious liability, and common law contribution against B&M.[19] B&M claims that Woodham and New Enterprise's Third-Party Complaints should be dismissed because they have no standing and because B&M has immunity pursuant to the Pennsylvania Workers' Compensation Act (PWCA). Under PWCA, employ ers are generally immune from suit when an employee's injury occurs

---

[19] Woodham and New Enterprise's Third-Party Complaints are exactly the same except for references to party names.

during the course and scope of his employment.[20] B&M also claims that the counts alleging sole

and direct liability to Plaintiffs for negligence and vicarious liability should be dismissed.

The Court agrees with B&M's argument with regard to New Enterprise and Woodham's

claims that B&M is directly and solely liable to Plaintiffs. A district court within the Third Circuit

stated the following with regard to third-party complaints:

> The crucial characteristic of a Rule 14 third-party claim is that the
> original defendant is attempting to transfer to the third-party
> defendant all or part of the liability asserted against him by the
> original plaintiff.
> Where, as here, state substantive law recognizes a right of
> contribution and/or indemnity, impleader under Rule 14 is the proper
> procedure by which to assert such claims. See Smith v. Whitmore,
> 270 F.2d 741 (3d Cir. 1959); Pennine Resources, Inc. v. Dorwart
> Andrew & Company, 639 F. Supp. 1071 (E.D.Pa. 1986). A third-
> party complaint may not set forth a claim that the third-party
> defendant is directly liable to the original plaintiff; it is limited to
> claims of secondary or derivative liability. Pennine Resources, 639 F.
> Supp. at 1076.

*In re* One Meridian Plaza Fire Litig., 820 F. Supp. 1492, 1496 (E.D. Pa. 1993). As such, the Court

finds that New Enterprise and Woodham cannot assert claims that B&M is directly liable to the

Plaintiffs and those claims will be dismissed.

New Enterprise's and Woodham's claims for contribution are governed by Pennsylvania's

adoption of the Uniform Contribution Among Tortfeasors Act (UTCA), 42 Pa. Cons. Stat. Ann. §§

8321-27. The UTCA was enacted "to establish generally the right of contribution among joint tort-

feasors and to provide the procedure whereby that right might be made effective in practice."

---

[20]B&M cites to the same Third-Party Beneficiary clause as was discussed with regard to New
Enterprise's Motion. B&M admits that Kimball was an intended beneficiary of the contract but denies that
any other entity was meant to benefit from it.

Swartz v. Sunderland, 169 A.2d 289, 291 (Pa. 1961). Contribution is an equitable principle based on the understanding that "as between the two tort-feasors . . . contribution is not a recovery for the tort but the enforcement of an equitable duty to share liability for the wrong done." Puller v. Puller, 110 A.2d 175, 177 (Pa. 1955).

Section 8324 has outlined the requirements for contribution under Pennsylvania law:

> (a) General rule: The right of contribution exists among joint tort-feasors.
>
> (b) Payment required: A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.
>
> (c) Effect of settlement: A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from a joint tort-feasor whose liability to the injured person is not extinguished by the settlement.

42 Pa. Cons. Stat. Ann. § 8324.

In other words, contribution may be asserted where 1) there is an allegation that the parties combined to produce the plaintiff's injury and 2) a tort-feasor has discharged or may discharge a common liability by paying more than his pro rata share. See Mattia v. Sears, Roebuck, & Co., 531 A.2d 789, 791 (Pa Super. 1987). The UTCA defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa. Cons. Stat. Ann. § 8322. Pennsylvania law also states that, "two actors are joint tortfeasors if their conduct 'causes a single harm which cannot be apportioned...even though [the actors] may have acted independently.'" Mattia, 831 A.2d at 791 (quoting Capone v. Donovan, 480 A.2d 1249, 1251 (Pa. Super. 1984).

In paragraphs 12-35, 42, 43, and 47-49 of their Third-Party Complaints, New Enterprise and

Woodham allege facts pertaining to B&M's negligent role in the death of Holbrook such that they

have sufficiently pled that B&M is a joint tortfeasor in this action. Paragraphs 46 and 52 also

address B&M being "liable to Woodham for contribution." However, since B&M was the

Plaintiff's employer, New Enterprise and Woodham are also required to plead a factual basis for

waiver due to Worker's Compensation immunity.

Woodham and New Enterprise have argued that 77 P.S. § 481 (b) permits B&M to waive its

Worker's Compensation immunity through contract:

> § 481. Exclusiveness of remedy; actions by and against third party;
> contract indemnifying third party; contract indemnifying third party
>
>> (a) The liability of an employer under this act shall be
>> exclusive and in place of any and all other liability to such
>> employes, his legal representative, husband or wife, parents,
>> dependents, next of kin or anyone otherwise entitled to
>> damages in any action at law or otherwise on account of any
>> injury or death as defined in section 301 (c)(1) and (2) or
>> occupational disease as defined in section 108.
>>
>> (b) In the event of injury or death to an employe is caused by
>> a third party, then such employe, his legal representative,
>> husband, or wife, parents, dependents, next of kin, and anyone
>> otherwise entitled to receive damages by reasons thereof, may
>> bring their action at law against such third party, but the
>> employer, his insurance carrier, their servants and agents,
>> employees, representatives acting on their behalf or at their
>> request shall not be liable to a third party for damages
>> contribution, or indemnity in any action at law, or otherwise,
>> unless liability for such damages, contributions or indemnity
>> shall be expressly provided for in a written contract entered
>> into by the party alleged to be liable prior to the date of the
>> occurrence which gave rise to the action.

77 P.S. § 481.

Woodham and New Enterprise have pled that B&M has waived its immunity for contribution through Section 30-11 of the General Provisions of B&M's contract with the Air Authority. Section 30-11 states as follows:

> CONTRACTOR, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY EXPRESSLY AGREES TO WAIVE ANY PROVISION OF THE "PENNSYLVANIA WORKMEN'S COMPENSATION ACT, INCLUDING SECTION 303 (b)" WHEREBY CONTRACTOR COULD PRECLUDE ITS JOINDER AS AN ADDITIONAL DEFENDANT OR AVOID LIABILITY FOR DAMAGES, CONTRIBUTION OR INDEMNITY IN ANY ACTION AT LAW, OR OTHERWISE WHERE CONTRACTOR'S EMPLOYEE OR EMPLOYEE'S HEIRS, ASSIGNS, OR ANYONE OTHERWISE ENTITLED TO RECEIVE DAMAGES BY REASON FOR INJURY OR DEATH BRINGS AN ACTION AT LAW AGAINST THE OWNER, ITS SUCCESSORS, ASSIGNS, EMPLOYEES, AGENTS, ENGINEERS OR ARCHITECTS.

(Doc. Nos. 109, 111, ¶ 38).[21]

New Enterprise and Woodham have sufficiently established their right to proceed against B&M for contribution if they are held liable to Plaintiffs. Based solely on the pleadings and the attached documents, the contractual waiver provision cited by New Enterprise and Woodham is a sufficient factual allegation of waiver on behalf of B&M for claims of contribution or indemnity in "an action at law against the owner, its successors, assigns, employees, agents, engineers or

---

[21]The contract provision does not suggest that Kimball is the only party intended to benefit from the waiver. However, Kimball or the owner must be sued in order for the waiver to be triggered. Thus, if Plaintiffs intended to benefit Kimball, there is also an argument that they intended to benefit any other entities named in the suit.

architects."[22] Therefore, the Court finds that New Enterprise and Kimball have sufficiently pled contribution under the circumstances presented in this case.

B&M also puts forth an argument that they will face undue prejudice if the Third-Party Complaints stand. The Court believes that the concerns of B&M were adequately taken into consideration when it granted the motion allowing the filing of the Third-Party Complaints and when it gave B&M deadlines for extended discovery. Therefore, the Court will not find that B&M has suffered undue prejudice in this instance.

## IV. Conclusion

For the reasons stated here in, the Motion for Summary Judgment filed by Kimball is granted and the Motion for Summary Judgment filed by New Enterprise is granted in part and denied in part. The Motion to Dismiss Third-Party Complaints filed by B&M is granted in part and denied in part.

An appropriate order follows.

---

[22]Although the claims against Kimball are dismissed, this does not alter the fact that Kimball was sued in this action.

56

**AND NOW**, this 30th day of September, 2008, in consideration of L. Robert Kimball's Motion for Summary Judgment (Doc. No. 118) and New Enterprise Stone and Lime, Inc.'s Motion for Summary Judgment (Doc. No. 122) and in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the L. Robert Kimball's Motion is GRANTED and New Enterprise Stone and Lime Inc's Motion is GRANTED as to Plaintiff's claim for punitive damages but DENIED in all other regards. IT IS FURTHER ORDERED THAT Bruce and Merrilees' Motion to Dismiss Third-Party Complaints (Doc. No. 146) is GRANTED as to New Enterprise and Woodham's claims for Bruce and Merrilees' direct and sole liability to Plaintiff and accordingly, paragraphs 44, 45, 50, and 51 are stricken from New Enterprise and Woodham's Third Party Complaint and the phrases "in the alternative" and "and/or jointly or severally liable to Plaintiff" are stricken from paragraphs 46 and 52 of both Third Party Complaints. To the extent Bruce and Merrilees' Motion addresses New Enterprise and Woodham's claims for contribution, the Motion is DENIED.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT**
**JUDGE**